FILED

2016 Sep-28  PM 04:29
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### JASPER DIVISION

| | | |
|---|---|---|
| REBA H. FELL, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 6:15-cv-00533-TMP |
| | ) | |
| CAROLYN W. COLVIN, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION

## I.    Introduction

The plaintiff, Reba H. Fell, appeals from the decision of the Commissioner of the Social Security Administration ("Commissioner") denying her application for Disability Insurance Benefits ("DIB").  Ms. Fell timely pursued and exhausted her administrative remedies and the decision of the Commissioner is ripe for review pursuant to 42 U.S.C. §§ 405(g), 1383(c)(3).  The parties have consented to the exercise of dispositive jurisdiction by a magistrate judge pursuant to 28 U.S.C. § 636(c).  (Doc. 17).  Accordingly, the court issues the following memorandum opinion.

Ms. Fell was 46 years old on the date of the ALJ's opinion. (Tr. at 30). Her past work experience includes employment as a framer, furniture builder, and housekeeper. *Id.* Ms. Fell claims that she became disabled on April 1, 2009, due to nerve damage from an injury of the left shoulder, arm, and neck, and anxiety. (Tr. at 270). The plaintiff also sought, and was awarded, a closed period of disability benefits from October 11, 2005 through October 11, 2006, immediately following the injury.

When evaluating the disability of individuals over the age of eighteen, the regulations prescribe a five-step sequential evaluation process. *See* 20 C.F.R. §§ 404.1520, 416.920; *see also Doughty v. Apfel*, 245 F.3d 1274, 1278 (11th Cir. 2001). The first step requires a determination of whether the claimant is "doing substantial gainful activity." 20 C.F.R. §§ 404.1520(a)(4)(i), 416.920(a)(4)(i). If she is, the claimant is not disabled and the evaluation stops. *Id.* If she is not, the Commissioner next considers the effect of all of the physical and mental impairments combined. 20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii). These impairments must be severe and must meet the 12-month durational requirements before a claimant will be found to be disabled. *Id.* The decision depends on the medical evidence in the record. *See Hart v. Finch*, 440 F.2d 1340, 1341 (5th Cir. 1971). An impairment is "severe" if it more than minimally affects the claimant's

ability to perform substantial gainful work.  If the claimant's impairments are not severe, the analysis stops.  20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii). Otherwise, the analysis continues to step three, which is a determination of whether the claimant's impairments meet or equal the severity of an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1.  20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii).  If the claimant's impairments fall within this category, she will be found disabled without further consideration.  *Id.*  If they do not, a determination of the claimant's residual functional capacity will be made and the analysis proceeds to the fourth step.  20 C.F.R. §§ 404.1520(e), 416.920(e). Residual functional capacity ("RFC") is an assessment, based on all relevant evidence, of a claimant's remaining ability to do work despite her impairments.  20 C.F.R. § 404.945(a)(1).

The fourth step requires a determination of whether the claimant's impairments prevent him or her from returning to past relevant work.  20 C.F.R. §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv).  If the claimant can still do his or her past relevant work, the claimant is not disabled and the evaluation stops.  *Id.*  If the claimant cannot do past relevant work, then the analysis proceeds to the fifth step. *Id.*  Step five requires the court to consider the claimant's RFC, as well as the claimant's age, education, and past work experience, in order to determine if he or

she can do other work.  20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v).  If the claimant can do other work, the claimant is not disabled.  *Id.*  The burden is on the Commissioner to demonstrate that other jobs exist which the claimant can perform; and, once that burden is met, the claimant must prove her inability to perform those jobs in order to be found disabled.  *Jones v. Apfel*, 190 F.3d 1224, 1228 (11th Cir. 1999).

Applying the sequential evaluation process, the ALJ found that Ms. Fell last met the insured status requirement on December 31, 2009.  (Tr. at 22).  She further determined that Ms. Fell had not engaged in substantial gainful activity between the alleged onset date of April 1, 2009, and the plaintiff's date last insured.  *Id.*  The ALJ goes on to say that there is no record of work activity for the plaintiff since the alleged onset date.  *Id.*  According to the ALJ, Plaintiff's complex regional pain syndrome ("CRPS"), affecting the posterior aspects of the plaintiff's left upper extremity, status post cervical spine fusion, anxiety disorder, and major depressive disorder are considered "severe" based on the requirements set forth in the regulations.  *Id.*  The ALJ also determined that the plaintiff suffered from the non-severe impairment of obesity.  (Tr. at 23).  She found that the plaintiff's impairments neither meet nor medically equal any of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  *Id.*  The ALJ did not find Ms. Fell's

allegations related to pain and the impact of her impairments to be totally credible, and determined that she has the residual functional capacity to "perform light work as defined in 20 CFR 404.1567(b) except with frequent performance of postural maneuvers but no climbing of ladders, ropes, or scaffolds.  The claimant should avoid overhead reaching, concentrated exposure to extreme cold and heat, and all exposure to dangerous moving unguarded machinery and unprotected heights. The claimant would be limited to unskilled work defined as understanding, remembering, and carrying out simple instructions, maintaining concentration and remaining on task for two hour periods throughout an eight-hour workday with all customary rest periods, and tolerating infrequent and well-explained workplace changes and occasional and non-intensive interaction with the general public." (Tr. at 23-24, 25).

According to the ALJ, Ms. Fell was unable to perform any of her past relevant work through her date last insured of December 31, 2009.  (Tr. at 30). The plaintiff is a "younger individual," and she has a "limited education," as those terms are defined by the regulations.  *Id.*  The ALJ determined that "transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is 'not disabled,' whether or not the claimant has transferable job

skills." *Id*.  The ALJ found that Ms. Fell has the residual functional capacity to perform a significant range of light work.  (Tr. at 31).  Even though Plaintiff cannot perform the full range of light work, the ALJ used the vocational expert's testimony as a guideline for finding that there are a significant number of jobs in the national economy that she is capable of performing, such as ticket taker, bench assembler/small products, and information clerk.  *Id*.  The ALJ concluded her findings by stating that Plaintiff "was not under a disability, as defined in the Social Security Act, at any time from April 1, 2009, the alleged onset date, through December 31, 2009, the date last insured." *Id*.

## II.    Standard of Review

This court's role in reviewing claims brought under the Social Security Act is a narrow one.  The scope of its review is limited to determining (1) whether there is substantial evidence in the record as a whole to support the findings of the Commissioner, and (2) whether the correct legal standards were applied.  *See Richardson v. Perales*, 402 U.S. 389, 390, 401 (1971); *Wilson v. Barnhart*, 284 F.3d 1219, 1221 (11th Cir. 2002).  The court approaches the factual findings of the Commissioner with deference, but applies close scrutiny to the legal conclusions. *See Miles v. Chater*, 84 F.3d 1397, 1400 (11th Cir. 1996).  The court may not decide facts, weigh evidence, or substitute its judgment for that of the Commissioner.  *Id*.

"The substantial evidence standard permits administrative decision makers to act with considerable latitude, and 'the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence.'" *Parker v. Bowen*, 793 F.2d 1177, 1181 (11th Cir. 1986) (Gibson, J., dissenting) (quoting *Consolo v. Federal Mar. Comm'n*, 383 U.S. 607, 620 (1966)).   Indeed, even if this court finds that the evidence preponderates against the Commissioner's decision, the court must affirm if the decision is supported by substantial evidence. *Miles*, 84 F.3d at 1400. No decision is automatic, however, for "despite this deferential standard [for review of claims] it is imperative that the Court scrutinize the record in its entirety to determine the reasonableness of the decision reached." *Bridges v. Bowen*, 815 F.2d 622, 624 (11th Cir. 1987).   Moreover, failure to apply the correct legal standards is grounds for reversal. *See Bowen v. Heckler*, 748 F.2d 629, 635 (11th Cir. 1984).

The court must keep in mind that opinions such as whether a claimant is disabled, the nature and extent of a claimant's residual functional capacity, and the application of vocational factors "are not medical opinions, . . . but are, instead, opinions on issues reserved to the commissioner because they are administrative findings that are dispositive of a case; i.e., that would direct the determination or

decision of disability." 20 C.F.R. §§ 404.1527(e), 416.927(d). Whether the plaintiff meets the listing and is qualified for Social Security disability benefits is a question reserved for the ALJ, and the court "may not decide facts anew, reweigh the evidence, or substitute [its] judgment for that of the Commissioner." *Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005). Thus, even if the court were to disagree with the ALJ about the significance of certain facts, the court has no power to reverse that finding as long as there is substantial evidence in the record supporting it.

## III.   Discussion

Ms. Fell alleges that the ALJ's decision should be reversed and remanded for three reasons. First, she argues that the ALJ erred as a matter of law in her evaluation of the plaintiff's chronic regional pain syndrome ("CRPS"). Second, the plaintiff contends that the ALJ did not properly evaluate the various medical source opinions in the record. And, third, she asserts that the ALJ failed to articulate fully her reasons for rejecting the testimony of the plaintiff's husband.

### A. The ALJ's Evaluation of the Plaintiff's CRPS

According to the plaintiff, the ALJ failed to apply the proper legal standard for assessing the plaintiff's CRPS. She claims that the ALJ inappropriately applied Social Security Ruling ("SSR") 03-2p by failing to properly evaluate the plaintiff's

credibility or apply the Eleventh Circuit pain standard.  An explanation regarding

the identification and evaluation of CRPS under the Social Security Administration

rules is provided by SSR 03-2p which states, as follows:

Policy Interpretation

*What is RSDS/CRPS?*

RSDS/CRPS is a chronic pain syndrome most often resulting from trauma to a single extremity.  It can also result from diseases, surgery, or injury affecting other parts of the body. Even a minor injury can trigger RSDS/CRPS.  The most common acute clinical manifestations include complaints of intense pain and findings indicative of autonomic dysfunction at the site of the precipitating trauma.  Later, spontaneously occurring pain may be associated with abnormalities in the affected region involving the skin, subcutaneous tissue, and bone. It is characteristic of this syndrome that the degree of pain reported is out of proportion to the severity of the injury sustained by the individual.  When left untreated, the signs and symptoms of the disorder may worsen over time.

. . .

RSDS/CRPS constitutes a medically determinable impairment when it is documented by appropriate medical signs, symptoms, and laboratory findings, as discussed above.  RSDS/CRPS may be the basis for a finding of "disability."  Disability may not be established on the basis of an individual's statement of symptoms alone.

For purposes of Social Security disability evaluation, RSDS/CRPS can be established in the presence of persistent complaints of pain that are typically out of proportion to the severity of any documented precipitant and one or more of the following clinically documented signs in the affected region at any time following the documented precipitant:

- Swelling;
- Autonomic instability—seen as changes in skin color or texture, changes in sweating (decreased or excessive sweating), changes in skin temperature, and abnormal pilomotor erection (gooseflesh);
- Abnormal hair or nail growth (growth can be either too slow or too fast);
- Osteoporosis; or
- Involuntary movements of the affected region of the initial injury.

When longitudinal treatment records document persistent limiting pain in an area where one or more of these abnormal signs has been documented at some point in time since the date of the precipitating injury, disability adjudicators can reliably determine that RSDS/CRPS is present and constitutes a medically determinable impairment. It may be noted in the treatment records that these signs are not present continuously, or the signs may be present at one examination and not appear at another. Transient findings are characteristic of RSDS/CRPS, and do not affect a finding that a medically determinable impairment is present.

. . .

Claims in which the individual alleges RSDS/CRPS are adjudicated using the sequential evaluation process, just as for any other impairment. Because finding that RSDS/CRPS is a medically determinable impairment requires the presence of chronic pain and one or more clinically documented signs in the affected region, the adjudicator can reliably find that pain is an expected symptom in this disorder. Other symptoms, including such things as extreme sensitivity to touch or pressure, or abnormal sensations of heat or cold, can also be associated with this disorder. Given that a variety of symptoms can be associated with RSDS/CRPS, once the disorder has been established as a medically determinable impairment, the adjudicator must evaluate the intensity, persistence, and limiting effects of the individual's symptoms to determine the extent to which the symptoms limit the individual's ability to do basis work activities.

For this purpose, whenever the individual's statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence, the adjudicator must make a finding on the credibility of the individual's statement based on a consideration of the entire case record. This includes the medical signs and laboratory findings, the individual's own statements about the symptoms, any statements and other information provided by treating or examining physicians or psychologists and other persons about the symptoms and how they affect the individual, and any other relevant evidence in the case record. Although symptoms alone cannot be the basis for finding a medically determinable impairment, once the existence of a medically determinable impairment has been established, an individual's symptoms and the effect(s) of those symptoms on the individual's ability to function must be considered both in determining impairment severity and in assessing the individual's residual functional capacity (RFC), as appropriate. If the adjudicator finds that pain or other symptoms cause a limitation or restriction having more than a minimal effect on an individual's ability to perform basis work activities, a "severe" impairment must be found to exist. See SSR 96-3p, "Titles II and XVI: Considering Allegations of Pain and Other Symptoms in Determining Whether a Medically Determinable Impairment is Severe" and SSR 96-7p, "Titles II and XVI: Evaluation of Symptoms in Disability Claims: Assessing the Credibility of an Individual's Statements."

SSR 03-2p, "Titles II and XVI: Evaluating Cases Involving Reflex Sympathetic Dystrophy Syndrome/Complex Regional Pain Syndrome, 2003 WL 22399117 (October 20, 2003).

The ALJ acknowledged that the plaintiff suffered from the severe impairment of CRPS. (Tr. at 22). Therefore, according to SSR 03-2p, the ALJ is

next to evaluate the limiting effect of the plaintiff's symptoms, as with any other medically determinable impairment.  There is no special or different analysis or assessment that applies to CRPS.  The ALJ addressed the claimant's credibility along with the medical evidence and applied the pain standard.  The ALJ addressed the plaintiff's CRPS symptoms as follows:

> The claimant alleges disability due to injuries to the neck and left shoulder and arm, nerve damage, anxiety, chronic pain, and major depressive disorder (Exhibits B2E and B14E).  In May 2009, the claimant reported pain affected her ability to sleep and limited her ability to independently perform personal care items, do household chores, and yard work.  The claimant also reported she needed reminders to take medications and accompaniment to go places, could only walk to the mailbox before stopping to rest, had problems getting along with others, did not spend time with others, and could not follow instruction or handle stress or changes in routine well.  However, the claimant reported she was able to prepare simple meals, drive, shop in stores, handle money accounts, and sit in a recliner and watch television and read all day (Exhibit B4E).  The claimant's husband corroborated some of the claimant's reports and added the claimant got nervous around people and dealing with changes but could walk 400-500 feet before stopping to rest, spend time with others, and attend church on a regular basis (Exhibit B3E).  At the hearing in March 2013, the claimant testified she received a workers' compensation settlement of $80,000 in April 2009 for an injury to her shoulder that included continuing medical coverage.  She also testified that she experiences pain in her neck, arms, and shoulders with stress and movement making the pain worse.  The claimant stated she was not able to do household chores and lies down all the time.  Additionally, the claimant stated her hands go dead with pain in the fingertips coming and going and she experiences problems with memory and concentration.  The claimant's husband, William Fell, also testified at the hearing and stated the claimant use [sic] to handle

paperwork for his company, but she has experienced a decline in mental functioning to the point she cannot comprehend instructions. Additionally, he stated the claimant need [sic] her medications fixed for her with someone to check up on her to make sure she took as prescribed. . . .

After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause some of the alleged symptoms; however, the claimant's and her husband's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible for the reasons explained in this decision.

The objective medical evidence is fully consistent with the above residual functional capacity and is inconsistent with allegations of disabling levels of pain and other subjective complaints.  The record shows the claimant injured her neck and shoulder in a work place injury in October 2005 (Exhibit B8F).  On March 18, 2008, the claimant was awarded a closed period of disability from October 2005 through October 2006 for the injury.  On that date the claimant signed a request for a closed period form that stated "the claimant agrees that medical improvement has occurred" (Exhibit B4A and B6D).  The claimant testified at her July 2010 hearing that she did sign the form requesting a closed period of disability with medical improvement and in fact that nothing in her condition had changed since the day she signed the form and her previously alleged onset date of March 20, 2008.  As such, it is a reasonable inference from this evidence that medical improvement did occur from her October 2005 work-place injury and continued on until at least March 2008.  The record shows January 2009 diagnostic imaging revealed an intact fusion with mild narrowing and shallow disc protrusion at the C5-6 disc without neural impingement of the cervical spinal cord and wide clavicle resection of the left shoulder with slightly elevated humeral head but intact joint with no evidence of residual or recurrent rotator cuff tear, subscapularis tendinopathy, or impingement.  Clinical examination showed decreased range of motion of the claimant's cervical spine and left shoulder but intact grip strength in both upper extremities (Exhibit B6F).  In April 2009, Dr. Cornelius, a treating physician for the

claimant, reported the claimant's physical position was similar to that of her MMPI finding two years earlier with hypersensitivity in the left scapula but examination showing inconsistent reports in the claimant's range of motion of her left arm and ability to palpate along the left upper extremity without difficulty (Exhibit B7F).   The following month, the claimant reported she was able to take a trip down to Mobile, Alabama with her sister and managed the trip well and was able to enjoy herself (Exhibit B13F).  The undersigned notes the distance for this trip would have been over 300 miles and four hours driving time one way indicating the ability to sit and travel for an extended period of time.  Additionally, treatment records in August 2009 noted the claimant was able to walk with a normal gait while wearing heeled shoes and maneuver a six and [a] half pound purse on her right arm.  Dr. Cornelius noted in November 2009 that the pattern of pain demonstrated and reported by the claimant was unlikely to be significant for spinal pathology such as a herniated disc.  Furthermore, the claimant continued to demonstrate a normal gait in early 2010 despite her continu[ing] to wear heeled platform shoes (Exhibit B13F).

The undersigned also notes the record contains consultative examinations conducted after the claimant's date last insured and finds this evidence further clarifies the picture in terms of the claimant's physical functioning as it gives a reference to what the level of functioning continued to be after December 31, 2009.  In August 2010, Dr. Norwood examined the claimant and found no neurological deficits.  While the claimant demonstrated variable power in testing left arm and shoulder, Dr. Norwood noted with distraction and repeated testing the claimant was able to show normal strength in all muscle groups of left arm including the left shoulder girdle muscles and the claimant's reports of variable pinprick appreciation over the left arm were without consistent findings.  In fact, clinical examination also showed good range of motion of the neck, low back, hips, knees, ankles, and right shoulder and arm, minimally antalgic gait, normal strength in the right upper extremity and lower extremities bilaterally, normal muscle tone and bulk in all extremities, no muscle spasm, ability to walk on heels and toes independently, arise from sitting position without assistance, oppose both thumbs and make fists bilaterally, use hand independently to open and close handicapped

accessible door and button and/or unbutton buttons, and her strength remained good even after repetitive exercise. Additionally, Dr. Norwood administered nerve conduction and EMG studies on the claimant's left arm with result showing no evidence of left cervical radiculopathy, left carpal tunnel syndrome, or other neuropathy in the left arm (Exhibit B16F). Furthermore, the undersigned notes his evidence is consistent with the subsequent findings on the claimant's October 2012 consultative examination which revealed only limited range of motion in the claimant's shoulders with normal range of motion in her neck, elbows, lumbar spine, hips, knees, and ankles with intact sensation to pin prick, position, and vibration (Exhibit B19F). Thus the undersigned finds the objective medical evidence does not demonstrate abnormalities which would interfere with the claimant's ability to perform the range of work identified above for the time period in question.

The course of medical treatment and the use of medication in this case are not consistent with disabling levels of pain and other complaints. While the claimant alleges disability in April 2009, review of the record shows the claimant had not been seen by Dr. Berke, treating physician, for over a year and a half before she was treated in January 2009 for reports of neck and left shoulder pain reaching a 6/10 pain level (Exhibit B6F). The record shows the claimant also sought treatment in January 2009 from Dr. Cornelius, pain management specialist, with reports of overdoing it with working around the house. There was no additional treatment sought by the claimant until April 2009 when the claimant was treated for emotional distress and suicidal ideation, but in an effort to accurately assess the claimant's condition, Dr. Cornelius also examined the claimant and noted the claimant's physical functioning was similar to that of her MMPI evaluation two years prior and her issues seemed to stem mostly from increasing mental symptoms. Despite this episode, the record shows the claimant improved to the point that she was able to make a trip with her sister to Mobile, Alabama with no significant difficulties in May 2009 and then in August 2009 the claimant reported she was able to perform household chores and attend church services on a regular basis. Treatment records show significant improvement in the claimant's reported symptoms with the claimant reporting a 50

percent improvement in her pain levels in November 2009 resulting in her feeling like her old self.  This improvement continued through December 31, 2009 with the claimant reporting on 5/10 pain levels as of January 2010 and an upwards of 60 percent improvement in pain levels with her condition noted as stable as of April 2010 (Exhibits B7F and B13F).  Furthermore, there is no indication in these treatment notes that the claimant requested frequent changes to her medication regime or sought alternative treatment modality, such as referral for biofeedback, a TENS unit, or physical therapy if the prescribed medications were not effective.  Therefore, the undersigned finds that the course of medical treatment in this case does not bolster the claimant's credibility with respect to the degree of her pain and other subjective complaints.

The claimant reported inconsistent abilities in her daily activities report and the undersigned finds these reports are inconsistent with disabling levels of pain.  While the claimant reported in her disability paperwork that pain affected her ability to independently perform personal care items and do household chores, the record shows the claimant reported to treating physicians that she was in fact able to perform some household chores and other activities of daily living.  In January 2009, the claimant reported overdoing it working around the house and then as of August 2009 she reported cleaning bathrooms, dusting, and doing other activities of daily living.   Additionally, treatment records noted the claimant was consistently very well groomed with jewelry on each finger, hair fixed, nails done, and full makeup applied.  The claimant was also noted to frequently wear heeled platform shoes and be able to maneuver a purse weighing over six pounds with no difficulties in her gait indicated (Exhibits B7F, B13F, and B21F).  Furthermore, the record shows the claimant reported being able to prepare simple meals, drive, shop in stores, handle money accounts, watch television, and read (Exhibits B4E and B8F).  The undersigned finds the claimant's reported daily activities show the claimant is not as limited as she has alleged and thus do not add credibility to the claimant's allegations that her impairments prevent her from being able to perform any type of work activity.

. . .

Finally, 20 C.F.R. 404.1529 requires the undersigned to consider the claimant's work history in assessing her credibility.  The claimant's earnings record shows very low lifetime earnings with a significant break of at least two years prior to her returning to work in 2004 (Exhibit B9D).  The record shows the claimant was injured in an October 2005 work-related injury for which she requested a closed period of disability for one year and received a workers' compensation settlement in the amount of $80,000 with continuing medical coverage in January 2008 (Exhibits B5D and B6D).  Despite the claimant's stipulation of medical improvement after October 2006 and testimony that [her] condition remained relatively the same up until at least March 2008, the claimant did not return to work.  However, treatment records do note the claimant consistently reported in 2009 and 2010 that she remained mostly at home attending to the duties about the house and being able to drive herself unencumbered from distances as great as Birmingham, Alabama, some one to two hours away (Exhibits B7F and B13F).  Additionally, the undersigned notes the record contains reports by the claimant's husband noting the claimant did all the business account work for his business at one point but it is unclear so [sic] to the time period in which she performed this work activity (Exhibits B17F and hearing).  Furthermore, treatment records show in January 2012 the claimant requested information on Vocational Rehabilitation training and state she had started putting in applications at local facilities, including nursing homes, looking for employment (Exhibit B21F).  As such, the undersigned finds that the claimant's work history does not lend great support to the credibility of her statements about her inability to work because of her pain and other subjective complaints.

As for the opinion evidence, the undersigned notes the record contains medical source statements from multiple parties and all the statements have been reviewed and considered by the undersigned.  In April 2013, Dr. Ragland, the claimant's general practitioner, opined the claimant would be unable to perform any work on an eight-hour per day or forty-hour per week basis and she would miss work more than two days per month on average and be unable to concentrate and stay a [sic] task for two hour periods of time (Exhibit B26F).  The

undersigned gives little weight to Dr. Ragland's opinion as it is not consistent with her own treatment records or the medical evidence as a whole for the time period in question. Dr. Ragland treated the claimant in May 2008 for poison oak exposure at which time the claimant requested weight loss medication and made no complaints of severe pain or frequent symptoms that would support Dr. Ragland's April 2013 opinion (Exhibit B5F). Furthermore, Dr. Ragland's subsequent treatment of the claimant in March 2009, the month prior to the claimant's alleged onset date, show[s] she only complained of cold-like symptoms including congestion and cough (Exhibit B12F). As such, the undersigned does not find Dr. Ragland's opinion in regards to the time period in question for this decision. Additionally, the undersigned notes the record contains a medical source statement regarding the claimant's physical functioning by Dr. Norwood, consultative neurologist. Dr. Norwood opined in August 2010 that the claimant could lift and/or carry 50 pounds frequently and 100 pounds occasionally, sit for two hours in an eight-hour workday. He further opined the claimant could frequently climb ladders and stairs and continuously reach, overhead reach, handle[,] finger, feel, push, pull, use foot controls, and perform postural maneuvers based upon finding no clear radicular features or evidence of neurologic deficit on examination or diagnostic testing (Exhibit B16F). The undersigned has considered Dr. Norwood's opinion and gives it some weight due to his specialization in this field of medicine leaving him well qualified to evaluate restrictions from a neurologic perspective and also the opinion's consistency with Dr. Norwood's own examination of the claimant. However, the undersigned finds the record as a whole shows abnormalities on clinical examination and objective diagnostic imaging that support the claimant's functioning was more limited as of December 2009 than expressed in Dr. Norwood's opinion.

. . .

Accordingly, based upon the substantial weight of the objective medical evidence, the claimant's course of treatment, her level of daily activity, her work history, and the medical source opinions of record, which have been given appropriate weight for the reasons cited above,

the undersigned finds that the claimant retains the residual functional
capacity for the reduced range of light work identified above.

 (Tr. at 24-30).

The plaintiff asserts that the ALJ failed "to recognize Fell's subjective
complaints that are consistent with the diagnosis of CRPS." (Doc. 14, p. 8).  She
points out that SSR 03-2p recognizes that one of the characteristics of CRPS is
complaint of pain disproportional to the severity of the precipitating injury or
condition.  From this, she contends that it is not surprising that she has severe pain
even with little evidence of a physical condition that can cause pain.

The ALJ noted that the plaintiff had the severe impairment of CRPS along
with anxiety and depression.  (Tr. at 22).  She also noted that "the claimant's
medically determinable impairments could reasonably be expected to cause some of
the alleged symptoms. . . ."  (Tr. at 25).  The ALJ did not ignore the plaintiff's
CRPS determination.  In this case, the plaintiff's severe impairment is one which is
recognized to be difficult to diagnose and the medical records of which may include
transient or irregular findings of a variety of symptoms, one of which is a presence
of more severe pain than "should" be caused by an underlying injury.  However,
SSR 03-2p discussing CRPS is clear that the presence of a severe medically
determinable impairment alone is not sufficient to require a finding of disability.

The plaintiff's symptoms and limitations must be evaluated in the same way symptoms and limitations are evaluated for any other medically determinable limitation that does not meet or equal a listing.  Merely the existence of CRPS does not dictate a finding of disability; the ALJ must still determine whether the condition precludes gainful employment.

The plaintiff also argues that the ALJ inappropriately applied the Eleventh Circuit's pain standard to the plaintiff's subjective allegations of disabling pain. Subjective testimony of pain and other symptoms may establish the presence of a disabling impairment if it is supported by medical evidence. *See Foote v. Chater*, 67 F.3d 1553, 1561 (11th Cir. 1995). To establish disability based upon pain and other subjective symptoms, "[t]he pain standard requires (1) evidence of an underlying medical condition and either (2) objective medical evidence that confirms the severity of the alleged pain arising from that condition or (3) that the objectively determined medical condition is of such a severity that it can be reasonably expected to give rise to the alleged pain." *Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005) (citing *Holt v. Sullivan*, 921 F.2d 1221, 1223 (11th Cir. 1991)); *see also Landry v. Heckler*, 782 F.2d 1551, 1553 (11th Cir. 1986).  The ALJ is permitted to discredit the claimant's subjective testimony of pain and other symptoms if she articulates explicit and adequate reasons for doing so. *Wilson v. Barnhart*, 284 F.3d

1219, 1225 (11th Cir. 2002); *see also* Soc. Sec. Rul. 96-7p, 1996 WL 374186 (1996) ("[T]he adjudicator must carefully consider the individual's statements about symptoms with the rest of the relevant evidence in the case record in reaching a conclusion about the credibility of the individual's statements."). Although the Eleventh Circuit does not require explicit findings as to a claimant's credibility, "'the implication must be obvious to the reviewing court.'" *Dyer*, 395 F.3d at 1210 (quoting *Foote*, 67 F.3d at 1562). "[P]articular phrases or formulations" do not have to be cited in an ALJ's credibility determination, but it cannot be a "broad rejection which is "not enough to enable [the district court or this Court] to conclude that [the ALJ] considered her medical condition as a whole." *Id.*

The ALJ determined that the plaintiff in the instant case met the first step of the pain standard, that she provided evidence of an underlying medical condition. *See Dyer*, 395 at 1210. However, the ALJ found that the plaintiff failed either to show objective medical evidence that confirms the severity of the pain or that the medical condition is of such a severity that it can be reasonably expected to give rise to the alleged pain. *Id.* The ALJ explained that the plaintiff's subjective testimony of pain was inconsistent with the medical record, as well as her description of her daily activities. As set out above, the ALJ cited both the medical record as well as the plaintiff's own testimony to support her determination that the plaintiff's

subjective pain testimony is not credible.  The determination of credibility is left to the ALJ and the ALJ is entitled to discredit the plaintiff's credibility so long as she articulates explicit and adequate reasons for doing so.  Here, the ALJ meets her burden.  The ALJ did not improperly analyze the plaintiff's CRPS under SSR 03-2p.

### B. Medical Source Opinions

The plaintiff also finds fault in the ALJ's determination based on her analysis of medical source opinions, including the plaintiff's treating physicians Dr. Doleys and Vanessa Ragland, D.O.   A treating physician's testimony is entitled to "substantial or considerable weight unless 'good cause' is shown to the contrary." *Crawford v. Commissioner of Social Security*, 363 F.3d 1155, 1159 (11th Cir. 2004) (quoting *Lewis v. Callahan*, 125 F.3d 1436, 1440 (11th Cir. 1997)) (internal quotations omitted). The weight to be afforded a medical opinion regarding the nature and severity of a claimant's impairments depends, among other things, upon the examining and treating relationship the medical source had with the claimant, the evidence the medical source presents to support the opinion, how consistent the opinion is with the record as a whole, and the specialty of the medical source. *See* 20 C.F.R. §§ 404.1527(d), 416.927(d). Furthermore, "good cause" exists for an ALJ to not give a treating physician's opinion substantial weight when the

"(1) treating physician's opinion was not bolstered by the evidence; (2) evidence supported a contrary finding; or (3) treating physician's opinion was conclusory or inconsistent with the doctor's own medical records." *Phillips v. Barnhart*, 357 F.3d 1232, 1241 (11th Cir. 2004) (*citing Lewis*, 125 F.3d at 1440); *see also Edwards v. Sullivan*, 937 F.2d 580, 583-84 (11th Cir. 1991) (holding that "good cause" existed where the opinion was contradicted by other notations in the physician's own record).

The court must also keep in mind that opinions such as whether a claimant is disabled, the claimant's residual functional capacity, and the application of vocational factors "are not medical opinions, . . . but are, instead, opinions on issues reserved to the Commissioner because they are administrative findings that are dispositive of a case; i.e., that would direct the determination or decision of disability." 20 C.F.R. §§ 404.1527(e), 416.927(d). The Court is interested in the doctors' evaluations of the claimant's "condition and the medical consequences thereof, not their opinions of the legal consequences of his [or her] condition." *Lewis*, 125 F.3d at 1440. Such statements by a physician are relevant to the ALJ's findings, but they are not determinative, as it is the ALJ who bears the responsibility for assessing a claimant's residual functional capacity. *See, e.g.,* 20 C.F.R. § 404.1546(c).

On July 20, 2010, Dr. Doleys completed a medical source statement noting that he had seen the plaintiff every 2-3 months from April 2009.  (Tr. at 478).  He opined that the plaintiff would not be able to sustain work activity for a regular 40-hour work week.  *Id*.  The ALJ addressed Dr. Doleys' opinion as follows:

> In regards to the claimant's mental functioning, the record shows several medical source opinions from different sources.  However, review of the record as a whole shows the claimant's mental functioning declined in April 2009 for a very short period of time due to lack of proper treatment and therapy, but significantly improved after completing a treatment program and she functions with moderate mental impairment on a continuing basis.  The undersigned gives little weight to Dr. Doley[s'] July 2010 opinion that the claimant cannot sustain work activity on a regular and continuing basis, as neither the complete record nor Dr. Doley[s'] own records support this conclusion (Exhibit B14F).  This opinion is not a specific assessment of the nature and severity of the claimant's impairments and based solely upon the subjective reports of symptoms and limitations provided to him by the claimant.  Yet, as explained elsewhere in this decision, there exist good reasons for questioning the reliability of the claimant's subjective complaints.  Furthermore, Dr. Doley[s'] own reports chronicle the claimant with a history of posturing and within a few months of expressing his opinion, Dr. Doley[s] noted the claimant reported significant improvement since treatment began with increased activities.  Due to the inconsistencies of the record and the doctor's opinion, Dr. Doley[s'] opinion is accordingly rendered less persuasive.

(Tr. at 29).  In short, the ALJ found that Dr. Doley's opinion that plaintiff could not work was inconsistent with his own treatment notes of her, supplying good cause to give less weight to the opinion.

The plaintiff was hospitalized for suicidal ideation on April 3, 2009. (Tr. at 415). After the plaintiff was released from the hospital, Dr. Doleys reported that the plaintiff exhibited emotional improvement, but not improved physical functioning. (Tr. at 480). Dr. Doleys recommended that the plaintiff continue out-patient treatment. *Id*. The plaintiff's first visit to Dr. Doleys was on August 10, 2009, during which the plaintiff reported cleaning bathrooms, dusting, and other activities of daily living that her medication enabled her to do. (Tr. at 471). The plaintiff also reported avoiding crowds and fear of touch. *Id*. Dr. Doleys stated that the plaintiff suffered from "activity avoidance and anticipatory pain." *Id*. On November 4, 2009, Dr. Doleys noted that the plaintiff's affect was "strained," but less tearful than past visits. (Tr. at 469). On January 27, 2010 (only a month after plaintiff's last date insured), Dr. Doleys noted that the plaintiff "continues to report that she is 50% improved." (Tr. at 465). The plaintiff also rated her pain at 5/10, and stated she was "substantially better" on Effexor. *Id*. The plaintiff's "[m]ood was much more stable" than it had been in the past. (Tr. at 465-66). On April 21, 2010, Dr. Doleys stated that the plaintiff avoids a good deal of social contact and remains mostly at home "attending to duties about the house." (Tr. at 462). He also stated that the plaintiff "continues to have a more stable mood th[a]n when she was first seen," and that her condition was stable. *Id*.

Dr. Doleys stated in his note from July 9, 2010, that the plaintiff was not anticipated to improve significantly, that she is "incapacitated" for 2 to 3 days per week and avoids crowds, but the plaintiff drove without problems to the doctor's office in Birmingham.  (Tr. at 457).

On January 25, 2011, Dr. Doleys noted that the plaintiff had begun reducing her opioid pain medication and exhibited minimal pain behavior with some apprehensiveness and anxiousness.  (Tr. at 554).  On July 7, 2011, the plaintiff "continue[d] to do fairly well" on her medication and was not particularly depressed, despite appearing fairly anxious.  (Tr. at 547).  On January 4, 2012, Dr. Doleys noted that the plaintiff was doing "fairly well," had no signs of psychological distress, and was discussing her need for a job.  (Tr. at 545).  In his notes from March 20, 2012, Dr. Doleys noted that the plaintiff has moderate to severe depression with ongoing pharmacological management.  (Tr. at 542).  On September 5, 2012, Dr. Doleys noted that the plaintiff was somewhat sullen, but that she exhibited minimal pain behaviors and used no assistive devices.  (Tr. at 534).  A survey of Doleys' medical records indicates that the ALJ's findings with regard to Doleys' opinion statement is supported by substantial evidence

On April 9, 2013, Dr. Ragland, the plaintiff's general practitioner, wrote a letter detailing her assessment of the plaintiff's health.  She noted that the plaintiff

suffers from depression and anxiety resulting from chronic pain.  (Tr. at 590).  Dr. Ragland opined that the plaintiff would miss more than two days per month of work and is unable to stay on task for two hours at a time.  *Id*.  The ALJ also addressed Ragland's opinion letter:

> In April 2013, Dr. Ragland, the claimant's general practitioner, opined the claimant would be unable to perform any work on an eight-hour per day or forty-hour per week basis and she would miss work more than two days per month on average and be unable to concentrate and stay [on] a task for two hour periods of time (Exhibit B26F).  The undersigned gives little weight to Dr. Ragland's opinion as it is not consistent with her own treatment records or the medical evidence as a whole for the time period in question.  Dr. Ragland treated the claimant in May 2008 for poison oak exposure at which time the claimant requested weight loss medication and made no complaints of severe pain or frequent symptoms that would support Dr. Ragland's April 2013 opinion (Exhibit B5F).  Furthermore, Dr. Ragland's subsequent treatment of the claimant in March 2009, the month prior to the claimant's alleged onset date, show she only complained of cold-like symptoms including congestion and cough (Exhibit B12F).  As such, the undersigned does not find Dr. Ragland's own treatment records nor the objective medical evidence as a whole support Dr. Ragland's opinion in regards to the time period in question for this decision.

(Tr. at 28-29).

The plaintiff saw Dr. Ragland on March 9, 2007, and did not report depression or anxiety during her appointment.  (Tr. at 400).  On January 6 and January 23, 2008, the plaintiff saw Dr. Ragland for ear pain.  (Tr. at 398-99).  She

reported no depression or anxiety at her January 6 visit, and no notes were made for the January 23 visit. *Id.* The plaintiff also reported no anxiety or depression on May 6 or May 16, 2008. (Tr. at 396). On September 16, 2008, the plaintiff saw Dr. Ragland and reported no anxiety or depression. (Tr. at 395). On March 21, 2009, the plaintiff saw Dr. Ragland for sinus congestion, cough, and headache, but reported no anxiety, depression, or severe pain. (Tr. at 456). The plaintiff reported no anxiety, depression, or severe pain on September 8 or September 14, 2011. (Tr. at 519-20). On July 13, 2012, the plaintiff saw Ragland for menopause symptoms. (Tr. at 518). The plaintiff visited Ragland on August 23, 2012, and reported abdominal pain. (Tr. at 517). Ragland's notes indicate that she suspects gallbladder issues. *Id.*

In her notes from February 5, 2013, Dr. Ragland assessed the plaintiff as having menopause syndrome, muscle pain, chest pain, and joint pain at multiple sites. (Tr. at 591). The plaintiff was instructed to continue her medication and was referred to a rheumatologist for evaluation. (Tr. at 591-92). Dr. Ragland signed-off on notes on February 25, 2013, and the plaintiff came in for a procedure related to menopause. (Tr. at 593). Again, a longitudinal examination of the Dr. Ragland's Records indicates that the ALJ's findings are supported by substantial evidence.

There simply is nothing recorded in Dr. Ragland's treatment notes indicating the plaintiff suffered from a debilitating medical or psychological condition.

The plaintiff contends that the ALJ erred in her evaluation of the opinions of consulting psychologist Bonnie Atkinson.[1]   The ALJ said of Atkinson's opinion that "[t]he undersigned also gives little weight to the June 2009 opinion by Dr. Atkinson, consultative psychologist indicating the claimant did not have sufficient judgment to make acceptable work decisions or manage her own funds as evidence of record received after this opinion was provided shows the claimant is not as limited as expressed in this opinion (Exhibit B8F)."   (Tr. at 29).   The plaintiff contends that the ALJ failed to evaluate Atkinson's opinion as it relates to the plaintiff's mental functioning.   This argument is without merit, however, because the ALJ clearly discussed Atkinson's opinion and determined, specifically, that later records showed that the plaintiff's abilities were not as limited as Atkinson opined.   (Tr. at 29).   The ALJ was within her discretion to give little or no weight to Atkinson's assessment because it was inconsistent with other psychological evidence and plaintiff's own testimony concerning her daily acitvities.

The plaintiff takes issue with the ALJ's failure to go into more detail about Atkinson's report, particularly Atkinson's diagnosis of Chronic Pain Disorder.

---

[1]   The plaintiff also states that the ALJ gave some weight to consulting psychologist Barry Wood. However, the ALJ states that Wood's opinion, along with that of state agency psychological consultant Dr. Estock, are most consistent with the evidence in the record.

However, the fact that the ALJ did not go into detail does not constitute a failure to consider Atkinson's opinion.   The ALJ is not required to refer to every piece of evidence in her determination so long as her denial of the plaintiff's claim is not an arbitrary dismissal that does not consider the plaintiff's medical condition as a whole.   *Dyer v. Barnhart*, 395 F.3d 1206, 1211 (11th Cir. 2005) (internal citations omitted).   A review of the ALJ's RFC determination persuades the court that the ALJ did consider the plaintiff's medical condition as a whole.   Accordingly, the ALJ's findings regarding Atkinson's opinion are supported by substantial evidence.

### C. Third-Party Testimony

Finally, the plaintiff argues that the ALJ failed to properly address the third-party function report and testimony by the plaintiff's husband, William Fell.   The plaintiff argues that, though the ALJ determined that Fell's testimony was not credible, she failed to articulate specific reasons for the determination.   As for Fell's testimony, the ALJ stated that,

> The claimant's husband, William Fell, also testified at the hearing and stated the claimant use[d] to handle paperwork for his company, but she has experienced a decline in mental functioning to the point she cannot comprehend instructions.  Additionally, he stated the claimant need[s] her medications fixed for her with someone to check up on her to make sure she took as prescribed.   The claimant's husband also testified the claimant could not drive and spent her time reading her Bible, sitting in the recliner or sofa, riding around in the car with her husband, and then lying down.   The claimant's husband further

testified he does not like to leave the claimant alone and he would take her to work with him or have one of his employees go an[d] check on her if he was unable to leave work himself.

After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause some of the alleged symptoms; however, the claimant's and her husband's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible for the reasons explained in this decision.

(Tr. at 25).

Third-party testimony by a lay-person is considered "other source" testimony in the Code of Federal Regulations. 20 C.F.R. § 404.1513(d)(4). According to the C.F.R., such evidence may be used "to show the severity of [the claimant's] impairment(s) and how it affects your ability to work." 20 C.F.R. § 404.1513(d). Such evidence is owed no particular weight under the rules. Accordingly, it is within the purview of the ALJ to determine that the testimony of the plaintiff's husband is not credible. Social Security Ruling (SSR) 06-3p further addresses the evaluation of such evidence, explaining:

In considering evidence from "non-medical sources" who have not seen the individual in a professional capacity in connection with their impairments, such as spouses, parents, friends, and neighbors, it would be appropriate to consider such factors as the nature and extent of the relationship, whether the evidence is consistent with other evidence, and any other factors that tend to support or refute the evidence.

> Explanation of the Consideration Given to Opinions From "Other Sources"
>
> Since there is a requirement to consider all relevant evidence in an individual's case record, the case record should reflect the consideration of opinions from medical sources who are not "acceptable medical sources" and from "non-medical sources" who have seen the claimant in their professional capacity.  Although there is a distinction between what an adjudicator must consider and what the adjudicator must explain in the disability determination or decision, the adjudicator generally should explain the weight given to opinions from these "other sources," or otherwise ensure that the discussion of the evidence in the determination or decision allows a claimant or subsequent reviewer to follow the adjudicator's reasoning, when such opinions may have an effect on the outcome of the case.

SSR 06-03p, Titles II and XVI:II and XVI: Considering Opinions and Other Evidence From Sources Who are not "Acceptable Medical Sources" in Disability Claims; Considering Decisions on Disability by Other Governmental and Nongovernmental Agencies, 2006 WL 2329939 (August 9, 2006).

Although the ALJ did not explain precisely which elements of Fell's testimony conflict with certain medical evidence in the record, the ALJ did note that she found the testimony not to be credible in a way that is sufficient to allow the court to follow the ALJ's reasoning, fulfilling her obligation under 20 C.F.R. § 404.1513 and SSR 06-03p.

**IV.   Conclusion**

Upon review of the administrative record, and considering all of Ms. Fell's arguments, the Court finds the Commissioner's decision is supported by substantial evidence and in accord with the applicable law. A separate order will be entered affirming the Commissioner's determination and dismissing this action.

DONE this 28th day of September, 2016.

_____
T. MICHAEL PUTNAM
UNITED STATES MAGISTRATE JUDGE